UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| BARBARA SANDS, | : | |
| --- | --- | --- |
| Plaintiff, | : | |
| v. | : | No. 5:17-cv-4160 |
| STATE FARM FIRE AND CASUALTY COMPANY, | : | |
| Defendant. | : | |

**O P I N I O N**
**Defendant's Motion for Partial Summary Judgment ECF No. 22—Granted**

**Joseph F. Leeson, Jr.**                                                              April 5, 2018
**United States District Judge**

      This case concerns a dispute between a homeowner and her insurer for coverage of hail damage to the homeowner's roof. Plaintiff Barbara Sands filed suit for breach of contract and statutory bad faith alleging that Defendant State Farm Fire and Casualty Company did not pay the value of her claim under her homeowner's insurance policy. State Farm has moved for partial summary judgment on Sands's bad faith claim. ECF No. 22. For the reasons discussed below, this Court finds that Sands has failed to establish by clear and convincing evidence that State Farm acted in bad faith, and accordingly grants State Farm's Motion for Partial Summary Judgment.

I.     **FACTUAL BACKGROUND**

      The following facts are either undisputed or are interpreted in the light most favorable to Sands, the nonmovant.

On July 25, 2016, a hailstorm damaged the roof and siding of Sands's house. Def.'s Stat. Facts ¶¶ 8, 10, ECF No. 22-3. Sands submitted a claim under her homeowner's insurance policy with State Farm. Def.'s Stat. Facts ¶ 9. Sands' policy, a "replacement cost policy," provides that State Farm will reimburse the homeowner for the repair or replacement cost necessary to return the homeowner to her pre-loss state. *See* Insurance Policy 27, Ex. H to Opp., ECF No. 24-6. Before repairs, State Farm pays only the "actual cash value" of the property, equal to the replacement cost minus depreciation and the policy's deductible. *See* Explanation of Benefits, Ex. 3 to Reply, ECF No. 25-4. Once the repairs are made, State Farm pays the withheld depreciation. *See* Insurance Policy 27, Ex. H to Opp.

State Farm assigned adjuster Roger VanHouwe to Sands's claim. Pl.'s Counterstat. Facts ¶ 5, ECF No. 24. VanHouwe retained a roofer named Ariel Fine to inspect Sands's roof and siding on behalf of State Farm. Def.'s Stat. Facts ¶ 12; Pl.'s Counterstat. Facts ¶ 7. Fine provided an inspection report and photos to State Farm, and VanHouwe determined that Sands's policy covered her loss. Def.'s Stat. Facts ¶¶ 13-14; Pl.'s Counterstat. Facts ¶ 10. VanHouwe determined an estimated replacement cost of $5,145.55. Pl.'s Counterstat. Facts ¶ 11. To prepare the estimate, VanHouwe used a computer application called Xactimate, which calculates depreciation, taking into account the material's condition and life expectancy. Pl.'s Counterstat. Facts ¶¶ 33-34, 41, 45. VanHouwe subtracted $3,380.75 in depreciation[1] and the policy's $1000 deductible to yield an actual cash value of $764.80, which State Farm paid to Sands. Pl.'s Counterstat. Facts ¶¶ 15-16.

---

[1]  Sands characterizes this amount as 65.70% overall depreciation, as the replacement cost was reduced by that percentage. Pl.'s Counterstat. Facts ¶ 17. State Farm objects that it did not take overall depreciation on the claim, but took 80% depreciation on roofing, 26.67% depreciation on foam insulation, and none on other materials. Def.'s Resp. Counterstat. Facts ¶ 17, ECF No. 26.

Sands filed this action, alleging breach of contract and bad faith against State Farm and contending that State Farm did not pay the full value of her claim. After the litigation began, State Farm retained Doug Weiss to inspect Sands's property. Pl.'s Counterstat. Facts ¶ 93. VanHouwe attended the inspection with Weiss on September 29, 2017, and concluded that he would have to write a revised estimate; however, he was told to "hold off" doing so by his team manager. Pl.'s Counterstat. Facts ¶¶ 94-95, 97. During his deposition, VanHouwe stated that the revised estimate would result in a supplemental payment to Sands. Pl.'s Counterstat. Facts ¶ 98. State Farm then determined that it owed Sands more money and on March 2, 2018, served a copy of its revised estimate with a letter enclosing a supplemental payment of $2,500.40. *See* Letter of March 2, 2018, Ex. 4 to Reply, ECF No. 25-4.

## II. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 257 (1986). The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. Fed. R. Civ. P. 56;

*Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

## III. ANALYSIS

### A. Statutory Bad Faith Claims

Pennsylvania's bad faith statute provides various remedies available to a court in an action arising under an insurance policy where the court determines that the insurer acted in "bad faith" toward the insured. 42 Pa. C.S. § 8371. The statute does not define "bad faith," and courts have interpreted Section 8371 to extend to a range of insurer conduct, such as unreasonable delay in handling claims, *Willow Inn, Inc. v. Public Serv. Mut. Ins. Co.*, 399 F.3d 224, 235 (3d Cir. 2005), and "frivolous or unfounded refusal to pay proceeds of a policy," *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004) (quoting *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994)).

Regardless of the specific conduct alleged, to succeed on a bad faith claim, the plaintiff must meet the "clear and convincing" standard, which requires the plaintiff to produce evidence

"so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Id.* (quoting *Bostick v. ITT Hartford Grp., Inc.*, 56 F. Supp. 2d 580, 587 (E.D. Pa. 1999)(internal quotations omitted)). This heavy burden applies even on summary judgment. *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012). To defeat a bad faith claim, an insurer must simply show a reasonable basis for its actions. *Id. See also Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999). Sands identifies three categories of State Farm's conduct that she argues support a bad faith claim: withholding excessive depreciation, relying on the Xactimate program, and State Farm's alleged delay in disclosing that it owed a supplemental payment.

1. **Excessive depreciation**

Sands argues that State Farm acted in bad faith by applying excessive depreciation to her roof when it calculated the actual cash value. Sands contends that State Farm withheld excessive depreciation on her claim to ensure a small up-front actual cash value payment that would prevent Sands from ever making the repairs and thus allow State Farm to retain the depreciation permanently. Opp. 27. A valid cause of action for an insurer's bad faith failure to pay the insured the value of her claim requires "clear and convincing evidence . . . that the insurer: (1) did not have a reasonable basis for denying benefits under the policy; and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *J.C. Penney Life Ins. Co.*, 393 F.3d at 367.

Sands recognizes an absence of Pennsylvania case law on the issue of bad faith withholding of excessive depreciation, but insists regardless that State Farm's "overall" rate of depreciation of 65.70% was unreasonable. She also complains that State Farm acted in bad faith because it based the depreciation calculation only on the roof's age and useful life without

reference to its condition, which she maintains was above average. Although Sands cites various cases to support her argument, none establishes that, as a matter of Pennsylvania law, depreciation must take into account both the property's age and its condition.[2]

Regardless, the undisputed material facts show that State Farm did take into account the condition of the roof. Ariel Fein, whom State Farm contracted to perform the first inspection of Sands's property, noted in his report that the roofing was 18-22 years old and in poor condition and that the aluminum siding was approximately 45-55 years old and in fair condition. *See* Fein Report, Ex. 1 to Reply, ECF No. 25-2. Fein found various shingles in "poor" and "non-repairable" condition and recommended replacing them. *Id.* Doug Weiss, who performed the second inspection for State Farm, found that the shingles on the front and rear first floor slopes required replacing because of hail damage, but noted that the siding was in fair condition. *See* Weiss Report, Ex. 2 to Reply, ECF No. 25-3. VanHouwe relied on these experts in preparing his estimates.

Sands tries to demonstrate that VanHouwe was dishonest in preparing the initial estimate. She makes much of the fact that the initial estimate included replacement of foam insulation in

---

[2] In *Owen v. Farmers Ins. Co.*, the court did hold that summary judgment was not appropriate on a bad faith claim where an insurer calculated depreciation based on the building's age, without considering its condition. No. CIV-12-384-FHS-KEW, 2014 WL 36643, at *3 (E.D. Okla. Jan. 6, 2014). However, the court based its conclusion on the "broad evidence rule" which Oklahoma law applies to calculate "actual cash value," *id.*; this rule does not apply in Pennsylvania. *See Kane v. State Farm Fire and Cas. Co.*, 841 A.2d 1038, 1047 (Pa. Super. Ct. 2003) (holding that the default meaning of "actual cash value" under Pennsylvania law is the cost to repair or replace the property). None of the other cited cases states that depreciation must incorporate the property's condition. In *Brown v. Everett Cash Mut. Ins. Co.*, the court did not interpret the meaning of depreciation generally speaking, but as defined in a specific insurance policy. 157 A.3d 958, 966 n.7 (Pa. Super. Ct. 2017). In *Dickler v. CIGNA Prop. & Cas. Co.*, the court analyzed depreciation under New York law, not Pennsylvania law, and recognized that multiple definitions of depreciation are possible other than simply physical deterioration. 957 F.2d 1088, 1098–99 (3d Cir. 1992). *Thorp v. Am. Aviation & Gen. Ins. Co.* involved an analysis of New Jersey law, and offered no clear definition of depreciation. 212 F.2d 821, 830 (3d Cir. 1954).

"average" condition, *see* Initial Estimate 8, Ex. H to Opp., ECF No. 24-8, but the second inspection determined that there was no insulation, *see* Weiss Report. Therefore, Sands concludes, VanHouwe's assertion that his estimate considered the actual condition of the property must be false, as he took depreciation on material that did not exist. Reply 30. The record reveals that VanHouwe did not act with such bad intentions: he testified that he assumed that there was insulation below the siding and assumed that, because the siding was forty years old and in average condition, the insulation would be as well. VanHouwe Dep. 273: 14-22. Moreover, including foam insulation was his standard practice when preparing an estimate for metal siding; if there was in fact no insulation, including it simply led to an overpayment by State Farm and a benefit to the insured. VanHouwe Dep. 276:5-13. The inclusion of siding shows, contrary to Sands's assertions, that VanHouwe was not reckless in preparing his estimate, but instead erred on the side of caution and overcompensating the insured. That his assumption was incorrect does not mean he acted in bad faith. *See Miezejewski v. Infinity Auto Ins. Co.*, No. CIV.A. 3:12-1000, 2014 WL 241966, at *5 (M.D. Pa. Jan. 22, 2014), *aff'd*, 609 F. App'x 69 (3d Cir. 2015) ("There is no legal requirement that insurance companies conduct perfect investigations"; rather, "[a]n insurance company simply must show it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action." (quotations omitted)).

Sands also tries to dispute the experts' assessments of the condition of her roof and siding. However, Sands does not provide her own roofing expert to dispute these findings. She argues that during VanHouwe's deposition, he admitted that depreciation of the roof and siding by eighty percent, the rate State Farm applied to Sands's claim, indicates a roof and siding in an overall poor condition, but conceded that based on the pictures he had observed, Sands's siding

7
040518

and roof were not in poor condition. Sur-Reply 3, ECF No. 30. Sands now presents similar photos of her roof and invites this Court to draw the same conclusion and find that it was not in poor overall condition. *See* Photos, Ex. B to Opp., ECF No. 24-2. She submits additional photos of a roof from another claim that VanHouwe handled and to which he also applied eighty percent depreciation, *see* Photos, Ex. P to Opp., ECF No. 24-16, and invites this Court to compare the two roofs and conclude that Sands's roof was in far better condition, such that eighty percent depreciation is not appropriate. However, this Court will not perform these imprecise qualitative comparisons and thereby act as Sands's roofing expert. In the absence of expert testimony, this Court cannot conclude that State Farm's inspectors drew unreasonable conclusions about the condition of Sands's roof and siding.

Sands does not claim that State Farm improperly accounted for the age of her roof and siding; she protests only that it failed to consider actual condition as well. But in arguing that the condition of her roof and siding did not justify eighty percent depreciation, Sands commits a similar error, and fails to take the age of the materials into account. By contrast, VanHouwe testified that, although eighty percent depreciation would not be appropriate for property in average condition if depreciation were measured on condition alone, eighty percent depreciation could be appropriate based on both age *and* average condition. VanHouwe Dep. 200:15-201:13. Sands has not shown that the inspectors' conclusions about the age and condition of her roof lacked a reasonable basis. Nor has she shown that VanHouwe lacked a reasonable basis for his estimates. At most, Sands has shown that she disagrees with State Farm's calculation of depreciation.[3]

---

[3] Sands reveals that she argues, in essence, that State Farm was incorrect when she states in her Sur-Reply that "[i]t will be for the jury to decide whether the amount of depreciation taken

8
040518

In this regard, she resembles the plaintiff in *Whalen v. State Farm Fire & Cas. Co.*, who challenged State Farm's calculation of depreciation under a policy similar to Sands's. 183 F. Supp. 3d 672, 682 (E.D. Pa. 2016). Whalen claimed that State Farm acted in bad faith by applying "straight line depreciation," which did not take into account the condition of the property. *Id.* at 683. The court granted summary judgment to State Farm on Whalen's claim because "Whalen's burden is to show by clear and convincing evidence that State Farm's decision to use the straight line method of calculating depreciation was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis when determining the depreciation method to use," so she could not survive summary judgment merely by asserting that she and State Farm disagreed about the value of the claim. *Id.*

Like the plaintiff in *Whalen*, Sands offers no evidence that she complained to State Farm about its calculation of depreciation.[4] Nor does she present any expert testimony or other evidence to show that State Farm used an unreasonable method of depreciation. And like the insurer in *Whalen*, State Farm has documented its findings with respect to the age and condition

---

was *right*, after viewing the physical evidence, and listening to the testimony of the various witnesses." Sur-Reply 3 (emphasis added).

[4] Sands protests that her failure to complain to State Farm about its method of calculating depreciation should not prevent her from recovering for bad faith. Sur-Reply 5-6. Although Sands is correct that a plaintiff does not need to prove that she complained to the insurer as an element of a bad faith claim, the court in *Whalen* did find it important that Whalen provided no evidence that she had complained to State Farm about the method of depreciation, and offered only an unsworn affidavit from her public adjuster attesting that State Farm should have considered the condition of the property, and that the property was in excellent condition. 183 F. Supp. 3d 672, 683 (E.D. Pa. 2016) ("Importantly, [plaintiff] provides no record evidence that she complained to State Farm that the method of depreciation it used was improper before starting suit."). This Court agrees: a plaintiff must prove that the insurer knew of or recklessly disregarded its lack of a reasonable basis for its action to prevail on a bad faith claim, and an insured's previous complaints may be relevant to show that the insurer knew of an issue but disregarded its obligations.

of the property. *See id.* at 683. As a result, Sands cannot prove by clear and convincing evidence that State Farm lacked a reasonable basis for its decision, or disregarded its lack of a reasonable basis. This Court grants summary judgment to State Farm on Sands's claim of bad faith withholding of excessive depreciation.

**2. Reliance on computer program for calculating depreciation**

Sands next claims that State Farm acted in bad faith because it relied on a computer program called Xactimate to calculate depreciation without investigating the "assumption models" Xactimate relies on. The useful life ages for materials were built into Xactimate, and State Farm calculated depreciation by inputting the age of the materials and allowing Xactimate to calculate the percentage of useful life remaining. Sands points to VanHouwe's testimony that he did not know whether Xactimate's useful life expectancies are accurate and that he did not investigate to determine their accuracy. From this admission, Sands concludes that VanHouwe and State Farm lacked a reasonable basis to believe the calculation of depreciation was accurate and their reliance on the calculation was "recklessly indifferent to the rights of Plaintiff." Opp. 35.

This argument does not persuade this Court. VanHouwe and State Farm did have a reasonable basis to believe that they could rely on Xactimate's calculations because Xactimate is a standard software in the insurance industry for estimating replacement costs. *See Mahli, LLC v. Admiral Ins. Co.*, No. 1:14CV175-KS-MTP, 2015 WL 4915701, at *7 (S.D. Miss. Aug. 18, 2015) (collecting cases where district courts recognized Xactimate as a reliable standard in the insurance industry). This Court cannot conclude that State Farm acted in bad faith by not second-guessing the depreciation calculations of an industry standard computer program whose sole

10
040518

purpose is to accurately make those calculations.[5] Perhaps Sands would have a stronger argument if she could present specific evidence of flaws in Xactimate's models or in the data which State Farm inputted into Xactimate. But she has not done so: Sands complains about the assumptions built into the Xactimate program, but presents no evidence that those assumptions are unreasonable other than her disagreement with the result of their application to her claim. Therefore, she cannot show bad faith by clear and convincing evidence, and this Court grants summary judgment to State Farm on the bad faith claim premised upon its using the Xactimate program.

### 3. Conduct after this litigation started

Lastly, Sands contends that State Farm has acted in bad faith in its handling of this case. She points to the second inspection of her property that State Farm obtained, performed by Doug Weiss on September 29, 2017. VanHouwe was at Sands's property for the inspection and identified damage that his original estimate did not include. However, VanHouwe's team manager told him to "hold off" writing a revised estimate. Weiss provided his report on January 23, 2018, after which VanHouwe's team manager told VanHouwe to prepare a revised estimate. The revised estimate resulted in a supplemental payment of $2,500.40, which State Farm issued to Sands on March 2, 2018.

Sands points to the five-month delay in the revised estimate and supplemental payment, from Weiss's inspection in September 2017 to State Farm's supplemental payment in 2018, as

---

[5] State Farm represents that although it did not independently investigate the life expectancies of materials built into Xactimate, it did review the white paper provided by the Xactimate designer which states that the life expectancies were obtained from the National Association of Home Builders based on extensive industry research. Def.'s Resp. Counterstat. Facts ¶ 42. This white paper further supported State Farm's reasonable basis for trusting Xactimate's calculations.

evidence of State Farm's bad faith. Sands concedes that there is no evidence to explain why VanHouwe's team manager told him to wait to prepare the revised estimate,[6] but suggests that State Farm delayed the supplemental payment until after settlement conferences in December 2017 and January 2018, *see* ECF Nos. 16-18, hoping that the case would settle without them having to make the supplemental payment. Opp. 36. In support of this inference, Sands points out that State Farm presented a settlement offer of $2,500, unusually close to the supplemental payment of $2,500.40. Sands suggests that this coincidence may not be a coincidence at all, that State Farm prepared the estimate well before it produced it to Sands, or at least gave its counsel a very accurate approximation before settlement discussions. As a result, Sands contends, a reasonable jury could conclude that State Farm acted in bad faith by withholding for five months its realization that it owed a supplemental payment.[7]

State Farm explains that it obtained the second estimate by Weiss to clarify issues after it received Sands's damages claim and public adjuster's estimate. Reply 9. As for the delay in the supplemental payment, Weiss did not issue his report until January 23, 2018. At the time of VanHouwe's deposition on February 19, 2018, he knew that additional money would be paid, but had been on vacation prior to his deposition and so had not completed the estimate nor determined the supplemental amount due. State Farm completed the estimate in late February

---

[6] VanHouwe testified that he did not know why he was told to wait. VanHouwe Dep. 240:21-23, Ex. C to Opp., ECF No. 24-3.

[7] Sands also portrays Paragraph 15 of State Farm's Statement of Facts, which states that "State Farm paid the covered damage it found at the home per the terms of the policy" as a knowingly false representation and an act of bad faith, given that at the time State Farm filed their motion for summary judgment, it knew that a supplemental payment was required, but had not made it yet. Resp. Stat. Facts ¶ 15. State Farm explains that Sands misunderstands Paragraph 15, which was simply part of the chronology of events leading to this case. Reply 9. This Court finds State Farm's explanation convincing and interprets Paragraph 15 to mean that State Farm paid what it believed was the proper amount of covered damage under the policy before the dispute that led to this action.

after obtaining Sands's deposition testimony regarding the exterior of her house. As far as the $2,500 settlement offer, State Farm seems to dismiss its resemblance to the supplemental payment as mere coincidence, particularly because they had not yet received Weiss's report at the time of the offer. Reply 10 n.8. State Farm represents that the offer is still available to Sands, even though State Farm made the supplemental payment. *Id.*

The Pennsylvania Superior Court has held that bad faith is actionable regardless of whether it occurs before, during, or after litigation. *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa. Super. 1999) ("[W]e refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured."). To establish a claim of bad faith based on the insurer's delay in paying the claim, the plaintiff must show that (1) the delay was attributable to the insurer; (2) the insurer had no reasonable basis for causing the delay; and (3) the insurer knew or recklessly disregarded the lack of a reasonable basis for the delay. *Mirarchi v. Seneca Specialty Ins. Co.*, 564 Fed. App'x. 652, 655–56 (3d Cir. 2014). But a delay on its own does not establish bad faith, and "if delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred." *Williams v. Hartford Cas. Ins. Co.*, 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000) (quotation omitted) (holding that a delay of fifteen months to resolve a claim was not so unreasonable that it was in bad faith, even though the insurer could have completed its investigation with greater speed).

State Farm did not act in bad faith simply because five months elapsed between the second estimate and the supplemental payment issued as a result of the estimate. Moreover, it seems that State Farm had a reasonable basis for the delay: Weiss did not issue his report until January 23, 2018, and State Farm reasonably could want to wait until it had as much information as possible before calculating and issuing a supplemental payment. *See Seto v. State Farm Ins.*

*Co.*, 855 F. Supp. 2d 424, 430 (W.D. Pa. 2012) (finding no bad faith delay in providing supplemental payment where parties had engaged in settlement discussions and State Farm had subpoenaed author of second estimate because "any delay attributable to State Farm is supported by a reasonable basis as it was actively engaged in investigation, valuations, and negotiations").

Sands seems to suggest that State Farm orchestrated a delay in Weiss's report, but provides no evidence to suggest this is the case. Weiss is an independent expert, not a State Farm employee. VanHouwe's team manager did tell VanHouwe to hold off on preparing a revised estimate, but Sands acknowledges that the record contains no evidence of VanHouwe's manager's intentions. VanHouwe's manager may have intended this delay to avoid a supplemental payment as Sands suggests, or she simply might have wanted VanHouwe to wait until State Farm had all the information in Weiss's report to use in the revised estimate. This Court acknowledges the similarity between State Farm's settlement offer and their eventual supplemental payment, but Sands has not produced any evidence to suggest it is other than a genuine coincidence. Although these facts make Sands's narrative that State Farm concealed its additional liability in the hopes of avoiding a supplemental payment because of settlement conceivable, the narrative remains highly speculative. Sands must show more than speculation, because she bears the particularly heavy burden of demonstrating bad faith by "the stringent level of clear and convincing evidence." *See Jung v. Nationwide Mut. Fire Ins. Co.*, 949 F. Supp. 353, 356 (E.D. Pa. 1997). In light of this unusually heavy burden, this Court does not find that Sands has produced sufficient evidence that State Farm concealed information and unreasonably delayed its payment to survive summary judgment on her bad faith claim. *See Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 591–92 (E.D. Pa. 1999) (finding that, where plaintiff argued Allstate knew the value of its claim but delayed settlement for more than a year, although

"some of Allstate's actions were less than forthright," plaintiff had not provided clear and convincing evidence of bad faith delay in payment), *aff'd*, 234 F.3d 1265 (3d Cir. 2000). State Farm is therefore entitled to summary judgment on Sands's bad faith claim premised on its conduct during the course of litigation.

## IV. CONCLUSION

Therefore, for the reasons expressed above, Sands cannot prevail on her bad faith claims, and State Farm's Motion for Partial Summary Judgment is granted. A separate order will issue.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge